[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case involves Kelly S., born November 5, 1990. At her birth, her pediatrician ordered a "96 hour hold" if an attempt was made to remove her from the hospital, and on November 8, 1990, an order of temporary custody (OTC) was obtained (Potter, J.) on the ground that she was in immediate physical danger from her surroundings and that immediate removal from such surroundings is necessary to insure her safety. Simultaneously with the OTC, coterminus petitions by the CT Page 10451 Commissioner of the Department of Children and Youth Services (DCYS) were served on the parents. The petitions, as amended on October 17, 1991, allege that Kelly is neglected and uncared for, and seek to terminate the parental rights of her mother, Eleanor Lynn S.(Lynn), and her father, Daniel S., on the grounds of no ongoing parent-child relationship and acts of commission or omission. DCYS also seeks a waiver of the one-year requirement.
The child, shortly after birth, became seriously ill with pneumonia and a gastroesophageal reflux, and was transferred from Day Kimball Hospital to the University of Connecticut Health Center and placed in intensive care. The child was discharged from the hospital about one month after her birth into foster care where she has remained since, and the order of temporary custody has remained in effect. Both parents were represented by counsel, and on the state of the record, the court (Sullivan, J.) appointed an attorney to act as guardian ad litem for the mother.
The trial on the petitions began on October 17, 1991, and was continued on October 25, 1991 and November 1, 1991, when testimony was completed. The parties filed briefs and the court heard oral argument on November 22, 1991. II
For reasons that were apparent in the pleadings and will be referred to later in this opinion, mother's attorney sought and was granted permission from the court to conduct a voir dire of mother to inquire into her competency.
The mother testified that she knew where she was and understood the purpose of the court proceeding. She was able to identify and define the roles of the attorney representing DCYS, her attorney and her guardian ad litem. She was also able to understand the role of the judge and was able to assist her attorney and her guardian ad litem in their representation of her. As there was some apprehension by counsel with respect to the appearance of mother's second personality "Lynn II, "mother was asked if "Lynn II" was present or would appear during the proceedings. Mother testified that "Lynn II" would not be involved or say a word in the proceedings and this was borne out. The court concludes from mother's testimony that she was competent to understand the nature of the proceedings and to assist her attorney and guardian ad litem in the trial. This conclusion was buttressed by the court's observations of mother's demeanor during the trial.
 III
Where coterminus petitions are filed under Section 17a-112 (e) (formerly Section 17-43a(e)), the court must proceed in three stages.
First, the court must determine whether the petitioner has met CT Page 10452 her burden by the preponderance of the evidence that the child was neglected or uncared for as alleged in the petition as of the date it was filed or last amended. If the petitioner has not, then both petitions must be dismissed. If the court finds that the child was neglected or uncared for, then disposition must be deferred until the termination petition has been adjudicated.
Second, if the court finds the child to have been neglected or uncared for, it must then determine whether any of the grounds alleged in the termination petition were proved by clear and convincing proof. If the petitioner failed to meet her burden as to any such grounds, the court must go back to the neglect/uncared for petition and determine an appropriate disposition. If grounds to terminate are proven, the court moves to the third stage.
Third, if grounds are found to both adjudicate the child neglected or uncared for and to terminate the rights of the parents, the court shall then consider whether the facts as of the date of the disposition, the last hearing date, support by clear and convincing evidence, after consideration of the six factors in Section17a-112 (d), that such termination is in the child's best interest. If the court finds that termination is not in the child's best interest it must go back and dispose of the neglect/uncared for petition. If the court finds that termination is in the child's best interest, then an order shall issue terminating the parents' parental rights.
 IV
At the trial, testimony was received from: Mary Ellen Soukup, social worker-case manager, and Susan Hibbard, R.N., prenatal clinic, both of Day Kimball Hospital; Dr. Garfield Danenhower, Kelly's pediatrician; Nancy Canata, social worker, birth to three; Susan Kristoff and Christine Nair, DCYS social workers; Richard B. Sadler, M.D., a psychiatrist and Robert Meier, a licensed clinical psychologist, court ordered evaluators; Sandy Rook, foster mother; Susan Holland, probation officer; and, Daniel S., the child's father. The mother, Lynn, elected not to testify. The court was requested to, and did without objection, take judicial notice of the order of temporary custody and documentary materials submitted with it. Also, a social study and supplemental social study for each petition, the evaluation reports of Drs. Sadler and Meiers, the Day Kimball and New Hampshire hospital records concerning mother and other documentary materials were placed into evidence.
On this evidence the court finds the following facts:
Lynn, the respondent mother, is a thirty-six year old woman with a long history of mental illness, including psychiatric hospital admissions. She has a psychotic disorder, which has manifested itself with two distinct personalities, "Lynn I" and "Lynn II." Lynn I CT Page 10453 carries on an internal conversation with Lynn II. She has demonstrated poor self-hygiene and urine incontinence and has shown angry, aggressive behavior. She hallucinated, and was unable to meaningfully participate in prenatal visits because of distractions relating to the hallucinations, which were, most likely, interactions with her other personality. She demonstrated no initiative or motive to attend her prenatal visits and would only do so when transportation was provided. She failed to attend post natal visits. Mother denied to Dr. Sadler that she had any mental illness or emotional disorder. In addition to Kelly, she bore three other children, one fathered by Daniel. All three were taken from her at birth by the New Hampshire equivalent to DCYS and placed in foster care because that agency felt she could not appropriately care for them. Termination proceedings in New Hampshire were completed as to the older two children and are pending as to the third.
According to Dr. Danenhower's report, Exhibit 7,
 "During [her] prenatal period her psychiatric diagnoses included multiple personality disorder, adjustment disorder with mixed emotional functions and borderline low average intelligence. Her behavior during the pregnancy is documented by the Obstetric Clinic and demonstrates that her diagnoses are current and active and that she is not capable of providing consistent loving and appropriate care for her infant."
At the time the petitions were served mother was living in a homeless shelter and father was incarcerated. At the time of trial the parents reside with two pets in a single room in Rogers, Connecticut, with no cooking facilities and a common bathroom in the hall, which is not suitable for a child. Neither parent works, and both receive public assistance.
The mother visited the child quite regularly, twenty-six one-hour visits between December 17, 1990 and October 7, 1991; father, irregularly, due in part to his incarceration and in-patient alcohol abuse treatment and a second, pre-trial incarceration for a violation of his probation, for eleven one-hour visits, all jointly with mother. All of the visitation was supervised by DCYS.
Father is thirty-four years old, of low intelligence and with severe mental impairment. He has been convicted twice of sexual molestation of male children, once in 1982 and recently in 1990. He also has a severe alcohol abuse problem; the terms of his probation include sexual offender and alcohol abuse therapy and treatment, which father voluntary terminated. AS a result, his probation was violated, leading to the pretrial incarceration previously mentioned. Father testified that his probation violation was disposed of for "time CT Page 10454 served," and he remains on probation with a suspended sentence remaining over his head. He also testified that he fathered a son from a previous marriage, who he raised until the child's death at eight years of age from leukemia. The details of this parenting were not disclosed by father to DCYS or Dr. Sadler, so there is no credible information as to its adequacy.
Kelly is a child with special needs. She is developmentally delayed by at least six months. Her pediatrician testified that she is a high risk baby with special needs and is demanding. Rearing a child in this condition would be taxing for a parent with normal abilities, as her medication and feedings require strict regulation. Caring for her requires constant diligence and vigilance; her reflux condition which could cause food to be regurgitated into her lungs could be life threatening. Nancy Canata testified that the child had to be held and positioned in a special way, as she couldn't tolerate lying on her stomach or on her back for long. Birth to three does development evaluations of children, and evaluated Kelly at three months old at the request of the foster mother, Sandy Rook. Ms. Canata found that Kelly had developmental delays in visual tracking, language and motor development, and recommended early intervention services. These were arranged for and provided so that Kelly is seen by a visiting nurse and a speech/occupational therapist on a regular basis. These professionals have instructed the foster mother on the therapies she performs on Kelly. Sandy Rook, a licensed foster mother, who has been a foster mother for ten years, testified that she has three to four people in her home every week who help her with Kelly, including a department of mental retardation aide, the occupational therapist, a visiting nurse and speech therapist. The therapists and foster mother try to teach Kelly to grasp and squeeze toys, roll over, track things visually and the like. Suffice it to say, the court concludes that Kelly needs full-time, almost twenty-four hours per day care, including therapy, medication, slow feedings of thirty to thirty-five minutes each, sphincter muscle stimulation, and other care beyond that required by a normal baby, and is reasonably likely to require such care in the future. It is significant to note that despite all of this intervention and therapy, and the round-the-clock care of a loving, giving, foster mother, (whose family also helps) Kelly is still substantially developmentally delayed.
Dr. Sadler testified that both mother and father are substantially impaired, and were barely able to care for themselves adequately and neither seperately or together were able to parent a normal child, let alone a child with special needs such as Kelly.
 V
In the neglect/uncared for petition, as amended, the petitioner alleges that Kelly is neglected by reason of being permitted to live under conditions, circumstances, or associations injurious to her CT Page 10455 well-being and is being denied proper care and attention, physically, educationally, emotionally or morally within the meaning of Section 46b-120 (ii) and (iii), and that Kelly is uncared for in that she is homeless or that her home cannot provide the specialized care which her physical, emotional or mental condition requires, within the meaning of Section 46b-120 (iv).
While there is no evidence that Kelly has been actually neglected or uncared for by the parents, as she has since birth been either in a hospital or competent foster home, the court finds from the evidence that Kelly is both a neglected and uncared for child, which the court further finds has been clearly proven by the petitioner by more than a fair preponderance of the evidence.
In this case, mother and father are barely able to care for themselves. They do not have a secure, stable, adequate home in which the child can reside. Neither can exercise appropriate judgment, and in the words of Dr. Sadler,
 "Mrs. S. has shown herself unable to effectively respond to the removal of four children from her home. She is no better able to deal with her ongoing psychiatric difficulties at this time than in the past. Mr. S. demonstrated more coherent and better organized psychologic functioning than did his wife. Mr. S., however, shows a massive failure to appreciate the multiple deficits and difficulties demonstrated by himself and his wife as far as their ability to care for themselves or for another person. Mr. S. has not been effective in securing adequate housing or stability for himself and he has not been successful in securing adequate treatment for his wife. . .Mr. S. appeared intellectually limited which further impairs his judgment. . .While Mr. S's intellectual limitations are a detriment to his parenting abilities, [his] psychological impairments prevent him from providing minimally adequare parenting. He lacks adequate judgment and he lacks an ability to identify and respond to the day-to-day demands of organizing his life in a stable and predictable fashion in order to demonstrate an ability to support, protect and nurture his children. . .I do not believe that there is a significant chance that Mrs. S. will be able to provide minimally adequate care for her child in the future. . .Mr. S's past history of risk of injury to a minor is a contributing factor although not necessarily the strongest factor suggesting his inadequate abilities to care for a child appropriately. . .Mr. CT Page 10456 S's parenting abilities are exceedingly unlikely to improve in the future regardless of his treatment program or environmental circumstances."
Dr. Meier who performed a court ordered evaluation of mother, testified that mother's impairments which go back to at least 1975, greatly affect her ability to parent, rendering her unable to do so. He testified that the child would be placed at emotional risk and risk of physical harm if in mother's care. He opined that even with intensive therapy and treatment there is no reasonable likelihood that mother could ever be an adequate parent. Even if she was placed in a supervised residential setting, with the child, she would be unable to effectively parent a child.
The court having had an opportunity to observe these experts, finds them credible and gives their testimony great weight. See In re Nicolina T., 9 Conn. App. 598, 605 (1987); cert. denied, 203 Conn. 804
(1987).
DCYS has a primary concern, the safety of the child. DCYS exercised its statutory duties by protecting the child by "providing a temporary or permanent nurturing and safe environment [for her] when necessary." Section 17a-101 (a). DCYS need not have to first entrust the child to the care of either or both of these parents to give them an opportunity to neglect the child or allow the child to be uncared for, in the light of the foregoing evidence. See In re Carlo.,10 Conn. App. 428 (1987); cert. denied, 204 Conn. 802 (1987).
The evidence is clear that the parents' parental deficiencies, if Kelly was in the care of either or both, would have permitted her to live under conditions, circumstances or associations injurious to her well-being and would have denied her proper care and attention physically, educationally, emotionally or morally. The evidence is also clear that Kelly is uncared for, in that she is homeless in the statutory sense and that her parents' home cannot provide the specialized care which her physical, emotional or medical condition requires. Section 46b-120. At the time DCYS took custody of Kelly, mother was in a shelter and father was incarcerated. While the court recognizes that a mother's residence in a shelter, by itself, is totally insufficient to prove a child homeless, her instability and inability to parent, by reason of her mental disorder and impairments taken together with father's incarceration effectively rendered the child "homeless" under the first prong of the statute. At the time of trial, although the parents obtained housing, it was totally inadequate, when viewed in the light of the parents' deficiencies, to be viewed as a home for the child. Moreover, the second prong of Section 46b-120 relating to specialized care was met by petitioner's proof. By no stretch of the imagination can these parents provide even ordinary care for a normal infant, let alone the specialized care needed by Kelly's physical, emotional or mental condition. CT Page 10457
Accordingly, the court adjudicates Kelly S. to be a neglected and uncared for child.
 VI
The court now turns to the termination petition alleging acts of commission or omission. In order to terminate the parents' parental rights under Section 17a-112 (b)(3), the petitioner must prove, and the court must find by clear and convincing evidence, that the child was and/or will be denied the care, guidance or control necessary for her physical, educational or moral well-being by reason of acts of commission or omission by the parents.
The court finds these additional facts which it considered together with the facts previously found. During the visitation sessions attended by the parents, they expressed no real depth of understanding of the needs of the child, or her condition. They did not question the foster mother or the DCYS worker about the child's care or requirements or about her medical condition. They did not affirmatively ask to feed, diaper or even hold the child. Indeed, on several occasions when they were instructed to hold the child in a special way, they promptly forgot or ignored these instructions. The visitation sessions were treated by the parents in large part as social occasions. In one instance, when DCYS had prepared a twelve minute video tape featuring the therapies required to be performed with the child, the parents lost interest in it after the first few minutes and began conversing about other matters between themselves.
This was so even though Ms. Nair discussed with both parents the importance of looking at the video and concentrating on it. Mother talked often during the video about other things, and frequently looked elsewhere than at the screen.
Susan Kristoff, a DCYS intake social worker, investigated a referral concerning a different family with whom mother was residing with in October 1991, as a result of being discharged from a homeless shelter on account of aggressive behavior interviewed her. This family had young children, and mother was alleged to have attempted to suffocate one of the children. Ms. Kristoff testified that when asked about this allegation, respondent mother replied, "I didn't try to kill the kid, just suffocate it."
The public policy of this state is "to protect children whose health and welfare may be adversely affected through injury and neglect" and "to provide a temporary or permanent nurturing or safe environment for children when necessary." Section 17a-101(a). (Formerly Section 17-38a.) (Emphasis provided.) By clear and convincing evidence, the petitioner has shown that neither parent is aware of and unable to provide for even the most basic needs of this CT Page 10458 infant, and that neither will be able to provide such needs in the forseeable future, for this very needy child. And this is so, even if intensive services were to be provided to the parents. This evidence is credible, uncontradicted and unshaken in cross-examination.
It would be both futile and absurd, and contrary to the expressed public policy embodied in Section 17a-101(a), to require this child to be placed in the custody of parents who clearly are and will be incapable of providing even basic care for her let alone the specialized care the child needs, for the sole purpose of demonstrating that she will suffer actual harm, injury or denial of the care, guidance and control required by Section 17a-112 (b)(3), before placing her in a safe, permanent, nurturing adoptive home.
The court finds that in order to comply with the expressed public policy of this state concerning the care and protection and welfare of children, it is necessary that she be placed in a permanent and safe home.
The court recognizes that mental disorders and impairments are not a ground for termination of parental rights, however, when these conditions impact upon their ability to function as parents, it is otherwise.
"Termination is warranted under Section 17a-112)b)(3) when the parent's mental illness manifests itself in conduct demonstrative of an inability to care for her children." In re Nicolina T., supra, 607. And when, as here, the evidence clearly and convincingly proves that acts of commission or omission are reasonably certain to occur ". . .the court then goes on to determine whether there is clear and convincing evidence that these parental acts or deficiencies support the conclusions that the parent cannot exercise, or should not, in the best interests of the child be permitted to exercise, parental rights and duties." In re Juvenile Appeal, (84-AB) 192 Conn. 254, 267 (1984). (Emphasis provided.) That is so in this case.
 VII
Section 17a-112 (b)(4) defines the ground of no ongoing parent-child relationship as having two prongs: first, it ". . .means the relationship that ordinarily develops as a result of a parent having met on a day to day basis, the physical, emotional, moral and educational needs of the child," and second, "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Each of these prongs must be established by clear and convincing evidence.
The evidence is clear and convincing that no ongoing parent-child relationship exists between the parents and Kelly. Nor could there be. CT Page 10459 The OTC and coterminus petitions were filed three days after her birth. During the child's stay at Day Kimball Hospital, the mother did see the child for brief times, and while the mother obviously cares for and loves the child, there was no opportunity for the child to bond to her mother. It is unclear from the record whether mother visited the child at UConn Health Center, but it appears that the parents' only contacts after Kelly's discharge from there were the one-hour visitation sessions previously described.
The father never paid child support, neither brought any gifts for the child (except blankets), neither called the foster mother to ask about the child or its health. The father stated that "he would have called if he had the telephone number," but admitted he never asked for it.
These visitation sessions did not permit the child to develop any recognition of the parents as her parents. She does not react to them when they arrive, nor react to their leaving. She appears to have "bonded" to her foster mother, Sandy Rook, to whom she looks to and relies on for all of her needs.
For the first prong, the standard as originally stated was whether the child had any memories or feelings for its natural parent. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670 (1979). However, the fact of some contact between parent and child does not preclude a finding of no ongoing relationship. In re Juvenile Appeal (Anonymous),181 Conn. 638, 646 (1980). The terms "memories of" and "feelings for" the natural parent refer to specific memories and feelings of a positive nature. In re James T., 9 Conn. App. 608, 616 (1987). In this case, although neither court evaluator, Dr. Sadler or Dr. Meiers, had an opportunity to perform a parent-child evaluation, the evidence given by the social worker, Christine Nair and Sandi Rook, the foster mother, that the parents did not focus on the child during visitation; discussions about physical therapy were held, but the parents did not seem to pay attention and appeared uninterested and seemed to show no desire to hear anything about Kelly's specific needs was credible and sufficient, by the clear and convincing standard that the child has no memories or feelings of any kind for the parents, and hence, there is no ongoing parent-child relationship.
As to the second prong, the court concludes that the petitioner has clearly demonstrated by clear and convincing evidence that to allow more time to establish such a relationship would be detrimental to the best interest of the child.
On this second prong, the determining factor is the child's best interest. In re Juvenile Appeal, 181 Conn. 638, 646 (1980).
The court is required to look into the future and decide whether the allowance of additional time for the development of a parent-child CT Page 10460 relationship would be harmful to Kelly. In re Juvenile Appeal (84-3),1 Conn. App. 463, 479, cert. denied, 193 Conn. 802 (1984). To do so, the court looks to the past and to the expert opinions, psychiatric and psychological. Mother's parental rights have already been terminated as to two children; and both parents' rights are in the process of being terminated as to a third. Indeed, neither parent indicated any understanding of why this has happened. Dr. Sadler opined that neither would be adequately able to parent in the future, either seperately or together, even with intensive therapy and treatment. Dr. Meier agreed as to mother. Both also were of the opinion that the child's best interest required determination of parental rights at this time, while the child could be expected to be best able to form an adequate attachment to a substitute parent. (Emphasis provided.)
The parents were in fact offered counselling, therapy and other services. Mother missed approximately one-half of her counselling sessions, and when asked why, she said she didn't want to go. Father, receiving sex offender therapy, was required to enter an inpatient alcohol treatment program, as his sex offender therapy could not be adequately addressed as a result of his alcohol abuse. He voluntarily left the inpatient program because he was lonesome for mother.
There is no doubt that the respondent parents, insofar as they capable, enjoy visiting Kelly. Clear and convincing evidence has established, however, that neither can care for the child, on any basis. The allowance of additional time for the establishment of a a parent-child relationship would not be in Kelly's best interest.
 VIII
The respondent parents claim that DCYS failed to provide sufficient assistance to the parents in an attempt to reunite their family. They argue that this is contrary to the public policy expressed in Section 17a-101(a) ". . .to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care," and by reason of DCYS' disregard of the statutory mandate, the parents' constitutional rights are violated. A similar claim was addressed in In re Juvenile Appeal, 192 Conn. 254, 258
(1984), where the court said, "The primary concern of DCYS is the safety of [the child]. `Family integrity can be the goal of DCYS only when such reunion will not endanger the safety of the child. Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings.'" (Emphasis in original.) The court finds that under the circumstances presented to DCYS at the time of the child's birth, and as later buttressed by the events occurring to the time of trial and the evaluator's reports and opinions, DCYS acted properly to take and retain custody of the child and seek termination, and had no CT Page 10461 duty to furnish supportive and rehabilitative service to the parents.
Even if it did have such a duty, the court further finds that while DCYS could have done more, it directly provided to, or referred, or was aware of, numerous supportive services which were designed to improve the conditions of the parents, and assist them to improve their parenting, were they able to do so.
The parents were permitted to and encouraged to visit with Kelly, and were furnished transportation by DCYS and United Services. DCYS agreed with the parents on certain expectations: to cooperate with DCYS and child's placement; cooperate with United Services, attempt to secure their own housing and maintain contact with the social worker. United Services is an organization which provides "case management services", a panoply of therapy, counselling, transportation, advice and the like. As stated, mother missed one-half of the counselling sessions. DCYS was aware of father's incarceration, and his conditions of probation (Petitioner's Ex. 9) which required "counselling to include continuing out-patient treatment for sex offenders." Father was convicted of violating his probation by his failing to comply with this condition. The hospital records indicate that the parents were clients of Northeast Young Parents Program and had access to it. Mother was referred by Day Kimball Hospital to United Services stating that mother met the DMR (Department of Mental Retardation) definition of chronically mentally ill for psychological/psychiatric services and case management. She was also offered post natal care services at Day Kimball Hospital which she did not avail herself of.
Dr. Sadler reports that mother stated on a number of occasions that she felt that parenting classes, a larger apartment, counselling and a car would be of help to the family. Mr. S. also recognized these needs and deficiencies. Dr. Sadler's report points out that neither parent has pursued adequate supportive services, although they recognized the need for them.
The court finds that sufficient supportive services were made available to the parents and that other services would have been made available if the parents had requested them or had taken advantage of the services actually offered. The respondents' claim lacks merit.
 IX
Section 17a-112 (c) provides, "[T]he court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."
The evidence is clear that by reason of their impairments, the parents are unable to provide even basic care for this specially needy CT Page 10462 child. The evidence is also clear and convincing that this condition had existed for a long time since Kelly's birth, and existed at the time of trial, and is not likely to improve within the forseeable future.
The court finds that waiting for the statutory period to go by will not be in the child's best interests or change the situation. At the same time, however, the need to obtain a stable, permanent home for the child at as early an age as possible is compelling. There is therefore no reason to delay termination which is inevitable under these facts as the court perceives them.
Accordingly, the court finds, on clear and convincing evidence, from the totality of the circumstances surrounding the child that a waiver of the one-year rule is necessary.
The court, having adjudicated Kelly S. as being neglected and uncared for, and having further found proven by clear and convincing evidence two statutory grounds for termination of both parents' parental rights, makes the six mandatory findings required by Section 17a-112 (d):
1. Efforts were made by DCYS and other agencies to facilitate reunion with the child. These included visitation, counselling, young parent's program; sex offender and alcohol abuse counselling; parenting training. See part VIII of this memorandum for a fuller description and discussion of these services and their effect.
2. The parents, after several missed visits, complied with court ordered evaluations which were the only orders. The parents also agreed with DCYS on certain expectations, which were not apparently made a court order. DCYS complied with the expectations. The parents substantially complied as to visitation, and did not comply as to the securing of adequate housing and counselling.
3. There are no feelings and emotional ties of the child for her parents. Her only feelings appear to be for her foster mother, who she recognizes as her principal caretaker and to whom she looks to for care and comfort.
4. The child's date of birth is November 5, 1990.
5. Neither parent is, or will be able to adjust their conduct, circumstances or conditions to make it in the best interest of the child to return her to their home in the forseeable future. Each, seperately or together, can barely function to provide his or her own basic needs, and would be unable to provide adequate care or stimulation to Kelly. Each has visited with the child and contacted DCYS, but not contacted the foster mother, except during the visits. DCYS has remained in contact with the parents and foster mother. CT Page 10463
6. No one has unreasonably prevented the parents from establishing a meaningful relationship with Kelly. Economic considerations are not a factor in this case.
 XI
Having considered all of the foregoing, the court finds by clear and convincing evidence that it is in the best interest of Kelly S. for her parents' parental rights to be terminated so that she may be reared and cared for in a stable, secure and nurturing home.
It is therefore Ordered that the parental rights of Eleanor L. (Lynn) S. and Daniel S. in and to Kelly S. are hereby terminated. It is further Ordered that the Commissioner of DCYS be appointed statutory parent for the purpose of forthwith placing Kelly S. in adoption, and to secure that result, the said Commissioner is further Ordered to submit to this court in writing within ninety days from the date of final judgment, a report as to the progress toward full adoption and every six months thereafter, until such adoption is consummated. The order of temporary custody (OTC) shall remain in effect pending an appeal, if any. Also, all supportive services presently provided parents shall remain in effect, together with such other services as may be appropriate.
 XII
The respondents in this case have twenty days from the date of notice of this judgment in which to take an appeal. If either of their trial counsel seeks to appeal, this court will appoint such trial counsel to act as appellate counsel at public expense until all appellate process is completed. If either, in the exercise of professional judgment as an officer of the Superior Court, declines to perfect such appeal because, in counsel's opinion, it lacks merit, counsel is not required to do so, but may timely file motions to withdraw and to extend the time to appeal as permitted by law. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines that an appeal lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The affected parent or parents will then be informed by the court clerk that they have the balance of the extended time in which to secure their own counsel for the purpose of taking such appeal who, if qualified, may be appointed by the court to represent them on appeal, with compensation from the State. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501 (1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if after the public defender of trial notifies both client and court that "he could not conscientiously proceed with the appeal, " CT Page 10464 another attorney is appointed to consider the matter of appeal and comes to the same conclusion. Even a convicted criminal defendant "cannot demand that the trial court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do so. Fredericks v. Reincke, 152 Conn. at 505. If such procedure satisfies the Sixth Amendment right to counsel where the only conflicting interests are those of the defendant who seeks review of his conviction and of the state which has a legitimate interest in avoiding the expense of judicial burden if the merit was appealed, it is a fortiori appropriate where there are interests of third parties involved: that of a child whose interests in achieving a permanent nurturing home should be entitled to at least as great a degree of consideration as that of the parents whose guardianship was terminated upon clear and convincing proof. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted and the termination order final. The need for finality of judgment in cases where the State initiates legal action against indigent respondents, which gave rise to the rules of Douglas and Fredericks, supra, must apply as much or more to cases where a young child for whom the passage of periods of time which may seem short for an adult or teenager, can be almost an eternity to an infant, and work changes with substantial and irreversible effects.
TELLER, J.